# EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 8-K

### CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d)
### OF THE SECURITIES EXCHANGE ACT OF 1934

Date of Report (date of earliest event reported): **April 23, 2018**

# BRAEMAR HOTELS & RESORTS INC.

(Exact name of registrant as specified in its charter)

| MARYLAND | 001-35972 | 46-2488594 |
|---|---|---|
| (State of Incorporation) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| 14185 Dallas Parkway, Suite 1100 | |
| Dallas, Texas | 75254 |
| (Address of principal executive offices) | (Zip code) |

Registrant's telephone number, including area code: **(972) 490-9600**

### ASHFORD HOSPITALITY PRIME, INC.
(Former name or former address, if changed since last report)

Check the appropriate box if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐    Soliciting material pursuant to Rule 14-a-12 under the Exchange Act (17 CFR 240.14a-12)

☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.    ☐

---

**ITEM 5.03    AMENDMENTS TO ARTICLES OF INCORPORATION OR BYLAWS; CHANGE IN FISCAL YEAR.**

Effective on April 23, 2018, Ashford Hospitality Prime, Inc. filed Amendment Number Two to its Articles of Amendment and Restatement ("Amendment No. 2") with the Maryland Department of Assessments and Taxation to change its name (the "Name Change") to "Braemar Hotels & Resorts Inc." (referred to herein as the Company).

The description of Amendment No. 2 in this Item 5.03 is qualified in its entirety by reference to Amendment No. 2, which is filed as Exhibit 3.1 hereto and is incorporated herein by reference.

**ITEM 7.01    REGULATION FD DISCLOSURE.**

On April 23, 2018, the Company issued a press release announcing the Name Change.  A copy of the press release is attached to this Current Report as Exhibit 99.1.

In addition, on April 23, 2018, the Company announced that it had changed its corporate website to http://www.bhrreit.com.  Furthermore, the Company's board of directors, upon the recommendation of its various committees, updated its Compensation Committee Charter, Audit Committee Charter, Nominating and Corporate Governance Committee Charter, Corporate Governance Guidelines and Code of Business Conduct and Ethics and Code of Ethics for the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer (the "Corporate Governance Documents").  Each of the Corporate Governance Documents has been posted to the Company's new website.

**ITEM 8.01    OTHER EVENTS.**

On April 23, 2018, in connection with the Name Change, the Company entered into the Fifth Amended and Restated Advisory Agreement with Ashford Inc., Braemar Hospitality Limited Partnership, Braemar TRS Corporation and Ashford Hospitality Advisors LLC (the "Amended and Restated Advisory Agreement").  The Amended and Restated Advisory Agreement amends the prior amended and restated advisory agreement only to reflect the Name Change and does not amend or otherwise alter the rights of any of the parties thereto.

The description of the Amended and Restated Advisory Agreement in this Item 8.01 is qualified in its entirety by reference to the Amended and Restated Advisory Agreement, which is filed as Exhibit 10.1 hereto and incorporated by reference herein.

**ITEM 9.01    FINANCIAL STATEMENTS AND EXHIBITS.**

(d) Exhibits

| Exhibit | Description |
|---|---|
| 3.1 | Amendment Number Two to Articles of Amendment and Restatement |
| 10.1 | Fifth Amended and Restated Advisory Agreement, dated as of April 23, 2018, among Braemar Hotels & Resorts Inc., Braemar Hospitality Limited Partnership, Braemar TRS Corporation, Ashford Hospitality Advisors LLC and Ashford Inc. |
| 99.1 | Press Release of the Company, dated April 23, 2018 |

**SIGNATURE**

Pursuant to the requirements of Section 12 of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: April 23, 2018

        BRAEMAR HOTELS & RESORTS INC.

        By:   /s/ Deric S. Eubanks
              Deric S. Eubanks
              Chief Financial Officer

**ASHFORD HOSPITALITY PRIME, INC.**
**ARTICLES OF AMENDMENT**

ASHFORD HOSPITALITY PRIME, INC. (the "<u>Corporation</u>"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Maryland, DOES HEREBY CERTIFY to the State Department of Assessments and Taxation of Maryland that:

FIRST: Article II, Section 1 of the charter of the Corporation is amended to read in its entirety as follows (the "<u>Amendment</u>"):

Section 1.  NAME.  The name of the Corporation is Braemar Hotel & Resorts Inc.

SECOND :  The foregoing amendment to the charter of the Corporation has been approved by at least a majority of the Board of Directors at a meeting held on April 4, 2018 and is limited to a change of name permitted by Section 2-605(a) of the Maryland General Corporation Law.

*[Remainder of Page Intentionally Left Blank]*

---

IN WITNESS WHEREOF, on this 20th day of April, 2018, the Corporation has caused this Amendment to the Articles of Amendment and Restatement of the Corporation to be executed and acknowledged in its name and on its behalf by its Chief Financial Officer and attested to by its Secretary; and the Chief Financial Officer acknowledges that these Articles of Amendment of Articles of Incorporation are the act of the Corporation, and the Chief Financial Officer further acknowledges that, as to all matters or facts set forth herein that are required to be verified under oath, such matters and facts are true in all material respects to the best of his knowledge, information and belief, and that this statement is made under the penalties for perjury.

ASHFORD HOSPITALITY PRIME, INC.

By:   /s/ Richard Stockton
      Richard J. Stockton,
      *Chief Executive Officer and President*

ATTEST:

By:    /s/ Deric S. Eubanks
       Deric S. Eubanks,
       *Chief Financial Officer*

**FIFTH AMENDED AND RESTATED ADVISORY AGREEMENT BRAEMAR HOTELS & RESORTS INC.**

THIS FIFTH AMENDED AND RESTATED ADVISORY AGREEMENT (this " *Amended Agreement* "), is dated as of April 23, 2018, by and between BRAEMAR HOTELS & RESORTS INC., a Maryland corporation (the " *Company* "), BRAEMAR HOSPITALITY LIMITED PARTNERSHIP, a Delaware limited partnership (the " *Operating Partnership* "), BRAEMAR TRS CORPORATION, a Delaware corporation, ASHFORD INC., a Maryland corporation (" *Ashford Inc.* "), and ASHFORD HOSPITALITY ADVISORS LLC, a Delaware limited liability company which is the operating company of Ashford Inc. (" *Advisors LLC* " and, together with Ashford Inc., the " *Advisor* "). The parties to this Amended Agreement are sometimes referred to herein individually as a " *Party* " or collectively as the " *Parties* ." Unless the context otherwise requires, the term " *Company* " and the term " *Advisor* " shall collectively include such Party and its respective Subsidiaries (including, with respect to the Company, the Operating Partnership and in the case of the Advisor, all Majority or Minority Subsidiaries). All capitalized terms used in this Amended Agreement shall have the meaning ascribed to those terms in Section 24 or as otherwise defined elsewhere in this Amended Agreement unless the context clearly provides otherwise.

WHEREAS, the Company invests primarily in high revenue per available room luxury hotels;

WHEREAS, the Parties entered into an Advisory Agreement dated and effective on November 19, 2013, which was amended and restated on May 13, 2014, again amended and restated on November 3, 2014 and again amended and restated on June 10, 2015 (the " *Existing Advisory Agreement* "), pursuant to which the Advisor agreed to perform certain advisory services identified in the Existing Advisory Agreement, on behalf of, and subject to the supervision of, the Board of Directors;

WHEREAS, the Company and the Advisor have discussed the desirability of certain amendments to the Existing Advisory Agreement, and, in doing so, subject to the Company Stockholder Approval, to amend and restate the Existing Advisory Agreement to include these amendments;

WHEREAS, the Company desires to continue to avail itself of the experience, brand relationships, lender and capital provider sources and relationships, service provider and vendor relationships, asset management expertise, sources of information, advice, assistance and certain facilities of the Advisor and to have the Advisor continue to provide the services hereinafter set forth, on behalf of, and subject to the supervision of, the Board of Directors, all as provided herein; and

WHEREAS, the Advisor is willing to continue to provide such services to the Company on the terms set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Amended Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

1

1. APPOINTMENT OF ADVISOR.

   (a) The Company appoints the Advisor as the Company's exclusive advisor of the Company pursuant to the terms of this Amended Agreement and acknowledges the continued role of the Advisor as the exclusive advisor of the Company, to provide the management and real estate services specified herein on the terms and conditions set forth in this Amended Agreement and the Advisor hereby acknowledges and accepts such appointment.

   (b) Concurrently with, and as a condition to, the effectiveness of this Amended Agreement:

      (i) the Escrow Agreement establishing the Termination Fee Escrow Account shall have been executed and delivered by the parties thereto in a form satisfactory to the Advisor;

      (ii) the Company shall have paid by wire transfer of same day funds to the account or accounts designated by the Advisor an amount in cash equal to five million dollars ($5.0 million); and

      (iii) the Company Stockholder Approval shall have been obtained.

2. DUTIES OF ADVISOR.

   2.1 Specific Duties . Subject to the supervision of the Board of Directors and the Company complying with its obligations hereunder, the Advisor shall be solely responsible for the day-to-day operations of the Company including all of its Subsidiaries

and joint ventures, and shall perform (or cause to be performed through one or more of its Affiliates or third parties) all services relating to the acquisition and disposition of hotels, asset management and financing and operations of the Company, all as may be reasonably required, which shall include the following:

(a) source, investigate and evaluate hotel acquisitions and dispositions consistent with the Company's Investment Guidelines (as defined in Section 9.3(a) below) and make recommendations to the Board of Directors;

(b) engage and supervise, at the Company's expense, third parties to provide services such as development management, property management, project management, design and construction services, investment banking services, financial services, property disposition brokerage services, independent accounting and auditing services and tax reviews and advice, transfer agent and registrar services, feasibility studies, appraisals, engineering studies, environmental property inspections and due diligence services, underwriting review services, consulting services, and other services, deemed by the Advisor to be reasonably necessary for Advisor to perform its duties hereunder;

(c) negotiate the material terms and conditions as well as definitive documentation of any acquisitions, dispositions, financings, restructurings or other transactions

2

with sellers, purchasers, lenders, brokers, agents and other applicable counterparties and representatives;

(d) coordinate and manage any joint ventures to which the Company is a party (including joint ventures with parties that are Affiliates of the Advisor or the Company), including monitoring and enforcing compliance with applicable joint venture or partnership governing documents;

(e) negotiate the terms of hotel management agreements, franchise agreements and other contracts or agreements of the Company, and modifications, extensions, waivers or terminations thereof including, without limitation, the negotiation and approval of annual operating and capital budgets thereunder;

(f) enforce, monitor and manage compliance of hotel management agreements, franchise agreements and other contracts or agreements of the Company, and modifications, extensions, waivers or terminations thereof;

(g) negotiate terms of loan documents ("*Loan Documents*") for the Company's financings;

(h) enforce, monitor and manage compliance with Loan Documents to which the Company is a party or is otherwise applicable to the Company;

(i) administer the Company's bookkeeping and accounting functions as are required for the management and operation of the Company, and, subject to the prior authorization of the audit committee of the Board of Directors (the "*Audit Committee*"), cause the Company to contract with independent public registered accountants and prepare or cause to be prepared such periodic reports and filings as may be required by any governmental authority, including but not limited to the Securities and Exchange Commission (the "*SEC*"), in connection with the ordinary conduct of the Company's business, and otherwise assist the Company with its compliance with applicable legal and regulatory requirements, including without limitation, proxy statements, annual, quarterly and other periodic reports and other filings required under the Securities Exchange Act of 1934, as amended (the "*Exchange Act*"), returns and filings under the Internal Revenue Code of 1986, as amended (the "*Code*") and any regulations or rulings thereunder, the securities and tax statutes of any state or other jurisdiction in which the Company is obligated to file such reports, or the rules and regulations promulgated under any of the foregoing;

(j) assist in preparing and filing any offering documents, registration statements and prospectuses included therein, and other forms or documents filed with the SEC pursuant to the Securities Act of 1933, as amended (the "*Securities Act*"), or any state securities regulations; *provided, however*, the Company shall be responsible for the content of any and all of its offering documents, SEC filings or state regulatory filings, including, without limitation, those filings referred to in Section 2.1(i), and the Advisor shall not be held liable for any costs or liabilities arising out of any misstatements or omissions in the Company's offering documents, SEC filings, state regulatory filings or other filings referred to in Section 2.1(i) and this

3

Section 2.1(j), whether or not material, and the Company shall promptly indemnify Advisor for such costs and liabilities;

(k)  investigate, evaluate, negotiate and otherwise manage and take actions it deems necessary to resolve all Proceedings to which the Company may be a party or otherwise involved or to which the Company may be subject other than any Proceedings to which the Advisor or any of its Affiliates are adverse to the Company, subject to such limitations or parameters as may be imposed from time to time by the Board of Directors, and cause the Company to retain such legal counsel, consultants and other third parties on behalf of the Company, as the Advisor deems necessary in connection with the foregoing, and coordinate, supervise and manage all such legal counsel, consultants and other third parties;

(l)  provide, or cause a third party to provide, the Company with personnel to perform the Company's risk management and oversight function;

(m)  provide office space, office equipment and personnel necessary for the performance by the Advisor of the services contemplated by this Amended Agreement;

(n)  cause the payments required to fulfill all of the Company obligations to be made, including without limitation payments of interest and principal on indebtedness of the Company and dividends or distributions to stockholders to the extent declared by the Board of Directors;

(o)  communicate with the Company's investors and analysts as required to satisfy reporting or other requirements of any governing body or exchange on which the Company's securities are traded and to maintain effective relations with such investors and assist the Company with public relations, marketing materials, website and investor relation services;

(p)  so long as the Board of Directors deems necessary, assist the Company in maintaining its status as a real estate investment trust for U.S. Federal income tax purposes ("*REIT*") and monitoring compliance with the various REIT qualification tests and other rules set out in the Code and Treasury Regulations thereunder and using commercially reasonable efforts to cause the Company to qualify for taxation as a REIT;

(q)  provide direction and guidance to the Board of Directors in connection with policy decisions considered by the Board of Directors;

(r)  furnish reports and statistical and economic research to the Board of Directors regarding the Company's activities, investments, financing and capital market activities and services performed for the Company by the Advisor;

(s)  asset manage and monitor the operating performance of the Company's real estate investments, including monitoring the management and implementation of capital improvement programs, pursue property tax appeals (as appropriate), and provide periodic reports with respect to the Company's investments to the Board of Directors, including comparative information with respect to such operating performance and budgeted or projected operating results;

4

(t)  establish, maintain and oversee the Company's bank accounts (provided that the Advisor shall not be required to provide or assist in proactive investment management strategies or invest excess cash in securities other than U.S. Treasuries);

(u)  consult with the Board of Directors regarding the Company's capital structure and capital raising;

(v)  take all actions reasonably necessary to enable the Company to comply with and abide by all applicable laws and regulations in all material respects subject to the Company providing appropriate, necessary and timely funding of capital;

(w)  provide the Company with an internal audit staff with the ability to satisfy any applicable regulatory requirements, including requirements of the New York Stock Exchange and the SEC, and any additional duties that are determined reasonably necessary or appropriate by the Audit Committee ("*Internal Audit Services*"); and

(x)  take such other actions and render such other services as may reasonably be requested by the Company consistent with the purpose of this Amended Agreement and the aforementioned services; *provided, that* any increase in the scope of duties or services to be provided by the Advisor (i) must be jointly approved by the Company and the Advisor according to Section 9.4 and (ii) will be subject to additional compensation determined in accordance with Section 9.4 .

2.2  Officers and Other Personnel .  The Advisor shall make available personnel necessary to perform the services and functions the Advisor is responsible for performing under this Amended Agreement, including persons to serve as officers of the Company.  The Parties agree that persons that are directors, managers, officers and employees of the Advisor or an Affiliate of the Advisor or any corporate parent of an Affiliate, may serve as a director or officer of the Company, except that no director, officer or employee of the Advisor or its Affiliates who also is a director or officer of the Company shall receive any compensation from the Company for serving as a

director or officer other than (a) reasonable reimbursement for travel and related expenses incurred in attending meetings of the Board; or (b) as otherwise approved by the Board, including a majority of the Independent Directors, and no such director shall be deemed an Independent Director. The Advisor or its Affiliates shall neither be obligated to dedicate any of their officers or other personnel exclusively to the Company nor is the Advisor, its Affiliates or any of its officers or other employees obligated to dedicate any specific portion of its or their time to the Company or its business, except as necessary to perform the services provided for in this Amended Agreement provided further that if the Advisor terminates the employment of Richard Stockton without the Company's consent, and the termination creates any cost or other liability to the Company in regards to unvested options or stock granted by the Company to Mr. Stockton, then the Advisor will be responsible for, and reimburse the Company for, the cost or other liability.

  2.3  Professional Services .

  (a)  The Advisor shall be entitled to rely on qualified experts and professionals (including, without limitation, accountants, legal counsel and other professional

5

service providers) hired by the Advisor at the Company's sole cost and expense. The Advisor may retain, for and on behalf, and at the sole cost and expense of the Company, such services of any individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization or other entity (each a " Person ") as the Advisor deems necessary or advisable in connection with the management and operations of the Company.

  (b)  The Parties agree and acknowledge that, to the extent applicable in connection with the application or qualification for any and all licensing exemptions and other exemptions contained in any professional regulatory laws, the Advisor and the Advisor's personnel are equivalent to "internal personnel" of the Company or shall be otherwise considered to meet applicable standards, and the Company shall not assert that they are not "internal personnel" under such circumstances. Notwithstanding anything to the contrary contained herein, neither the Advisor nor any of its personnel are performing nor shall be required to perform services hereunder that would require the Advisor or any of its personnel to be licensed as a real estate broker in any state or other jurisdiction.

  (c)  Notwithstanding the fact that certain officers and other personnel employed by the Advisor may be both licensed attorneys (each licensed attorney, an " Advisor Attorney ") and officers, managers, partners or employees of the Company, whenever an Advisor Attorney provides legal advice and services in his or her capacity as a manager, partner, officer or employee of the Company, then the Advisor Attorney shall be deemed to be acting in that capacity solely for the Company, and not as a manager, partner, officer or employee of the Advisor or under the control or direction of the Advisor, even if paid by the Advisor. No Advisor Attorney shall be required to provide legal advice to the Company in any situation in which the Company and the Advisor are adverse.

  2.4  Board of Directors Matters .

  (a)  In accordance with Article VII, Section 4 of the charter of the Company, the Company shall nominate persons designated by the Advisor as candidates for election as directors at any stockholders meeting at which directors are to be elected such that the Advisor designees constitute as nearly as possible 29% of the Board of Directors, in all cases rounding to the next larger whole number, for so long as this Amended Agreement is in effect.

  (b)  The Company shall not amend Article VII, Section 4 of the charter of the Company as in effect as of the date of this Amended Agreement or make any other amendments to the charter or bylaws of the Company that would in any way impair the ability of the Company to comply in full with its obligations under this Amended Agreement.

  (c)  The Parties stipulate that a breach of this Section 2.4 would cause irreparable harm and that the obligations of the Company under this Section 2.4 shall, in addition to any other remedies available at applicable law, be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.

  2.5  Certain Related Party Matters . Any waiver, consent, approval, modification, enforcement matter or election required to be made by the Company under the

6

Mutual Exclusivity Agreement between the Company, Remington Lodging and Hospitality, LLC (" Remington ") and Monty J. Bennett, dated as of November 19, 2013, as the same may be amended from time to time, or the Master Management Agreement between the Company and Remington, dated as of November 19, 2013, as the same may be amended or supplemented from time to time, shall be within

the exclusive discretion and control of a majority of the Independent Directors (or higher vote thresholds specifically set forth in such agreements) unless specifically delegated to the Advisor by a majority of the Independent Directors.

        2.6      <u>Increase in Scope of Duties</u>. Any increase in the scope of duties or services to be provided by the Advisor must be jointly approved by the Company and the Advisor pursuant to <u>Section 9.4</u> and will be subject to additional compensation in accordance with <u>Section 9.4</u>.

        2.7      <u>Asset Management</u>. The Advisor shall be the Company's sole and exclusive asset manager with authority to source, evaluate and monitor the Company's investment opportunities consistent with the Company's Investment Guidelines, and to direct the operation and policies of the Company, such as managing the Company's assets and monitoring the operating performance of the Company's hotel real estate investments and other assets, including the management and implementation of capital improvement programs, pursue property tax appeals (as appropriate), and providing periodic reports with respect to the Company's hotel real estate investments and other assets to the Board of Directors, including comparative information with respect to such operating performance and budgeted or projected operating results.

3.      AUTHORITY OF ADVISOR.

        (a)      Subject only to the express limitations set forth in this Amended Agreement and the continuing authority of the Board of Directors over the management of the Company, the power to direct the management, operation and policies of the Company shall be vested solely and exclusively in the Advisor, including, without limitation, the authority to (i) locate, analyze and select investment opportunities; (ii) structure the terms and conditions of transactions pursuant to which investments will be made or acquired for the Company; (iii) arrange for financing or refinancing of the Company's assets; (iv) enter into hotel management agreements, franchise agreements and other contracts or agreements of the Company, and modifications, extensions, waivers or terminations thereof including, without limitation, the negotiation and approval of annual operating and capital budgets thereunder; (v) oversee duly qualified and licensed property managers and other Persons who perform services for the Company; (vi) arrange for, or provide, accounting and other record-keeping functions; (vii) administer distributions and dividends; and (viii) administer the sale, conveyance, contribution or transfer of assets and related closings thereof. Notwithstanding the foregoing, all material decisions with respect to annual capital plans, brand conversions, the commencement or settlement of litigation matters, investment decisions, capital market transactions, annual budgets and management and franchise options recommended by the Advisor, including the acquisition, sale, financing and refinancing of assets, shall be subject to the prior authorization of the Board of Directors, except to the extent such authority is expressly delegated by the Board of Directors to the Advisor. Additionally, if the charter or Maryland General Corporation Law requires the prior approval of the Board of Directors, the Advisor may not take any action on behalf of the

7

Company without the prior approval of the Board of Directors or duly authorized committees thereof. In such cases where prior approval is required, the Advisor will deliver to the Board of Directors such documents and supporting information as may be reasonably requested by the Board of Directors to evaluate a proposed investment (and any related financing) or other matters requiring the Board of Directors' authorization.

        (b)      The Company hereby authorizes the Advisor, and appoints the Advisor as its attorney-in-fact, to, without limitation, execute and file or record, if necessary, any instrument, document, notice or agreement on its behalf pursuant to the authority granted pursuant to <u>Section 3(a)</u> or otherwise granted by the Company to the Advisor under this Amended Agreement. This power, being coupled with an interest, shall be irrevocable until this Amended Agreement is terminated pursuant to <u>Section 12</u> and all amounts payable pursuant to <u>Section 12</u> (including without limitation any Termination Fee) have been paid, satisfied and discharged in full.

4.      BANK ACCOUNTS.

        (a)      The Advisor shall, and hereby is authorized to, and shall have the exclusive right and authority to, establish and maintain subject to any applicable conditions or limitations of loan documents applicable to the Company, one or more bank, brokerage or similar accounts in the Advisor's own name for the account of the Company or in the name of the Company and collect and deposit into any account or accounts, and disburse from any such account or accounts, any and all money, securities and other cash equivalents on behalf of the Company, provided that no funds shall be comingled with the funds of the Advisor. The Advisor shall from time to time render appropriate accountings of such collections and payments to the Board of Directors and the independent auditors of the Company.

        (b)      In addition to any rights and remedies provided to the Advisor by this Amended Agreement or under applicable law, the Advisor shall have the right in its sole discretion, without prior notice to the Company, to set off, take and apply any monies of the Company on deposit in any bank, brokerage or similar account established and maintained for the Company by the Advisor pursuant to this <u>Section 4</u> or any money on deposit in the Termination Fee Escrow Account to the payment of all amounts becoming due and

payable by the Company; provided, that exercise of any set-off right shall not impact the Company's obligation to pay any obligations that remain due and payable following set-off by the Advisor.

5. PAYMENT OF EXPENSES.

5.1 <u>Reimbursable Expenses</u>.

(a) Except as provided herein, the Company shall pay directly or reimburse the Advisor, on the terms provided herein, all of the expenses paid or incurred by the Advisor or its Affiliates on behalf of the Company or in connection with the services provided to the Company pursuant to this Amended Agreement, including, but not limited to:

(i) tax, legal, accounting, advisory, investment banking and other third party professional fees; Board of Directors' fees, retainers and expense

8

reimbursements, taxes and assessments on income or property and taxes as an expense of doing business;

(ii) any deposits or retainers required by a third party prior to providing services required by the Company or the Advisor;

(iii) underwriting and brokerage fees and charges;

(iv) costs associated with insurance (including errors and omissions insurance requested by <u>Section 8.2</u> purchased by the Advisor);

(v) interest and fees and expenses arising out of borrowings made by the Company, including, but not limited to, costs associated with establishing and maintaining any of the Company's credit facilities, other financing arrangements, or other indebtedness of the Company (including commitment fees, accounting fees, legal fees, closing and other similar costs) or any of the Company's securities offerings;

(vi) expenses connected with communications to holders of the Company's securities and other bookkeeping and clerical work necessary in maintaining relations with holders of such securities and in complying with the continuous reporting and other requirements of governmental bodies or agencies, including, without limitation, all costs of preparing and filing required reports with the SEC, the costs payable by the Company to any transfer agent and registrar, expenses in connection with the listing or trading of the Company's securities on any exchange, the fees payable by the Company to any such exchange in connection with its listing, costs of preparing, printing and mailing the Company's annual report to the Company's stockholders and proxy materials with respect to any meeting of the Company's stockholders and any other reports or related statements;

(vii) travel and entertainment expenses;

(viii) conference sponsorships and other costs and expenses related to conferences;

(ix) transaction diligence and closing costs;

(x) dead deal costs or distributions paid by the Company;

(xi) costs and expenses associated with administering all equity awards or compensation plans established by the Company, including the value of awards made by the Company to the employees, officers, Affiliates and representatives of the Advisor;

(xii) expenses (including the Company's pro rata portion of rent, telephone, printing, mailing, utilities, office furniture, equipment, machinery and other office and overhead expenses) relating to any office(s) or office facilities, including disaster backup recovery sites and facilities, maintained for the Company or the investments of the Company, the Advisor or their Affiliates required for the operation of the Company;

9

(xiii) any costs and expenses incurred by the Advisor to enforce its rights under Section 12, Section 16 or Section 19 but only to the extent that the Advisor is the prevailing party in the applicable Proceeding; and

(xiv) any other costs incurred or paid by the Advisor that the Advisor believes, in its sole discretion, are reasonably necessary for the performance by the Advisor of its duties and functions under this Amended Agreement and including any expenses incurred by Advisor to comply with applicable laws or governmental rules or regulations that impose duties on the Company or the Advisor in its capacity as advisor to the Company.

(b) To the extent that any expenses or costs incurred or paid by the Advisor are also attributable to any other entity advised by the Advisor (including, without limitation, Ashford Trust), the Company shall only be responsible for its allocable share of the office and administrative expenses of the Advisor incurred in providing its duties pursuant to this Amended Agreement allocated as reasonably determined by the Advisor in its discretion pursuant to a methodology reviewed by the Audit Committee on a quarterly basis.

5.2    Advisory Agreement Matters.

(a) Except as provided below, the Advisor shall be responsible for all wages, salaries, cash bonus payments and benefits related to all employees of the Advisor providing services to the Company (including any officers of the Company who are also officers of the Advisor), provided that the Company shall reimburse the Advisor or be directly responsible for: (i) any expenses for wages, salaries, cash bonus payments and benefits paid by the Advisor to employees providing services related to the Internal Audit Services described in the next sentence, (ii) expenses related to the equity compensation awarded by the Company to employees, officers, Affiliates and representatives of the Advisor pursuant to Section 6.3 below, and (iii) all reasonable international office expenses, overhead, personnel costs, travel and other costs directly related to Advisor's non-executive personnel that are located internationally or that oversee the operations of international assets or related to Advisor's personnel that source, investigate or provide diligence services in connection with possible acquisitions or investments internationally ("*International Expenses*"). The Company shall reimburse the Advisor, on a monthly basis, the Company's pro-rata portion (as reasonably agreed to between the Advisor and a majority of the Company's Independent Directors or the Audit Committee, chairman of the Audit Committee or lead director) of all expenses related to (x) employment of the Advisor's internal audit managers and other employees of the Advisor who are actively engaged in providing Internal Audit Services to the Company, (y) the reasonable travel and other out-of-pocket costs of the Advisor relating to the activities of the Advisor's internal audit employees and the reasonable third party expenses which the Advisor incurs, in each case, in connection with providing Internal Audit Services, and (z) the International Expenses. These expenses contemplated by this Section 5.2(a) shall include, but are not limited to, salary, wages, payroll taxes and the cost of employee benefit plans.

10

(b) The Company also shall pay or reimburse the Advisor for any and all expenses incurred by the Advisor, its board of directors or any committee thereof related to:

(i) the preparation, negotiation and execution of any further amendment of this Amended Agreement initiated or contemplated by the Company or any other third party including with respect to a potential transaction that could result in a Company Change of Control, for any reason, including but not limited to any third party's interest in proposing, pursuing, evaluating, negotiating or completing a potential transaction that could result in a Company Change of Control, whether or not any amendment to this Amended Agreement is ultimately completed or abandoned and without regard to the status of the preparation and negotiation of any amendment and including but not limited to any discussion and analysis of the terms and provisions of this Amended Agreement or the process whereby services are performed hereunder that occurs in connection with the foregoing; and

(ii) the costs and expenses, including but not limited to indemnification for Expenses pursuant Section 8.3(a), related to discussion and analysis of, responding to or defending against any Proceeding related to this Amended Agreement or any amendment thereto, including actual or contemplated Proceedings brought by or against third parties by the Advisor, the Company or any other Indemnified Party but excluding any Proceeding brought by a stockholder of the Advisor against the Advisor.

(c) Expenses and costs reimbursable under this Section 5.2 shall include the fees and disbursements of legal counsel (including counsel to the Advisor's board of directors or any committee thereof) and other consultants, advisors or other professionals retained in connection with the matters described in Section 5.2(a) and any fees and expense reimbursements payable to members of the Advisor's board of directors for service on any committee of thereof established in connection with the matters described in Section 5.2(a) but excluding, for these purposes, any costs incurred by the Advisor, its board of directors or any committee thereof prior to the date of this Amended Agreement to evaluate or negotiate this Amended Agreement.

5.3    Employee Costs.

(a) Except as otherwise set forth herein, or agreed by the Parties, the Company shall have no obligation to reimburse the Advisor for any wages, salaries, payroll taxes, cash bonus payments, employee benefit plan costs and other benefits ("

*Employee Costs* ") incurred by the Advisor with respect to employees of the Advisor providing services related to the day-to-day operation of the Company.

       5.4     Reimbursement Procedures.

          (a)     The Company shall pay the costs and expenses that are reimbursable to the Advisor pursuant this Amended Agreement on a monthly basis in advance on the first business day of each month in an amount equal to the "Budgeted Monthly Reimbursements" for the applicable month, subject to reconciliation as provided in Section 5.4(b) hereof if the "Actual Monthly Reimbursements" for the applicable month differ from the Budgeted Monthly Reimbursements. The "*Budgeted Monthly Reimbursements*" for

each month shall be equal to the amount estimated to be payable on account of the costs and expenses that are reimbursable to the Advisor pursuant this Section 5 for each month included in each annual expense budget prepared by the Advisor and approved by the Board of Directors (the "*Annual Expense Budget*"); *provided, that*, if the Parties do not agree on an Annual Expense Budget for the applicable fiscal year, the Budgeted Monthly Reimbursements for each month of the existing fiscal year shall be equal to 110% of the Actual Monthly Reimbursements for the same month in the prior fiscal year.

          (b)     No later than forty-five (45) days following the end of the applicable fiscal quarter, the Advisor shall calculate (and provide the Company with a copy of the calculation) the costs and expenses that were actually reimbursable to the Advisor pursuant this Section 5 for each month (each amount, the "*Actual Monthly Reimbursements*") in the fiscal quarter just ended. The Company shall have ten (10) business days to review and comment upon the calculation provided by the Advisor. If the aggregate Actual Monthly Reimbursements payable as calculated by the Advisor for the fiscal quarter just ended exceeds the aggregate Budgeted Monthly Reimbursements paid by the Company pursuant to Section 5.4(a) for the fiscal quarter (the difference being referred to as a "*Reimbursement Underpayment*"), then the Company shall pay the Advisor the full amount of the Reimbursement Underpayment no later than 55 days following the end of the applicable fiscal quarter. If the aggregate Budgeted Monthly Reimbursements paid by the Company pursuant to Section 5.4(a) for the fiscal quarter just ended is greater than the aggregate Actual Monthly Reimbursements payable as calculated by the Advisor for the fiscal quarter (the difference being referred to as a "*Reimbursement Overpayment*"), then the Advisor shall repay the Reimbursement Overpayment to the Company no later than 55 days following the end of the applicable fiscal quarter.

    6.     COMPENSATION. For services rendered by the Advisor, the Company shall pay the Advisor the compensation set forth in this Section 6.

       6.1     Base Fee.

          (a)     The Company shall, on a monthly basis, pay a fee (the "*Base Fee*") in an amount equal to 1/12th of 0.70% of the sum of (i) the Total Market Capitalization for the prior month, and (ii) the Key Money Gross Asset Value, if any, on the last day of the prior month during which this Amended Agreement was in effect; *provided, however* in no event shall the Base Fee for any month be less than the Minimum Base Fee.

          (b)     The Company shall pay the Base Fee or the Minimum Base Fee on the fifth business day of each month based on the calculation in Section 6.1(a) above.

       6.2     Incentive Fee.

          (a)     In each year that: (i) Company Common Stock is listed for trading on a national securities exchange for each day of the applicable year; and (ii) the Company's Total Shareholder Return exceeds the simple average Total Shareholder Return for the Peer Group (the "*Incentive Fee Threshold*") for the applicable year, the Company shall pay to the Advisor the Incentive Fee.

          (b)     "*Incentive Fee*" means an amount calculated as:

          (i)     the amount by which the Company's annual Total Shareholder Return exceeds the Incentive Fee Threshold expressed as a percentage but capped at 25% (the "*Excess Return*"), multiplied by

          (ii)     0.05, multiplied by

(ii) the product of (A) the number of shares of Company Common Stock on a fully-diluted basis (assuming, for these purposes, all Common Units and long term incentive partnership units in the Operating Partnership to the extent these units have achieved economic parity with Common Units have been converted into shares of Company Common Stock) multiplied by (B) the Market Price of Company Common Stock at December 31 of the applicable calendar year (or last day of the stub period, if applicable).

(c) With respect to any year that the Company Common Stock is not listed for trading on a national securities exchange for each day of the applicable year, by January 31 of the next year, the Company shall pay to the Advisor an amount equal to:

(i) the Incentive Factor, multiplied by

(ii) the Gross Asset Value of all of the Company's assets on the last day of the year.

(d) If this Amended Agreement is terminated on a day other than the last trading day of a calendar year, then the Company's Total Shareholder Return, the Incentive Fee Threshold and the Total Shareholder Return for each Peer Group Member will be calculated using the closing trading price of Company Common Stock and each Peer Group Member's common stock on the last trading day immediately preceding the date of termination of this Amended Agreement, and the Incentive Fee, if any, shall be reduced proportionately based on number of days in which this Amended Agreement is in effect for the applicable calendar year.

(e) Except as otherwise provided herein, the Incentive Fee, if any, is not due and payable unless the FCCR Condition set forth in Section 6.2(g) is satisfied. Except as otherwise provided herein, any Incentive Fee that is earned by the Advisor shall be due and payable in three (3) equal annual installments with the first installment payable on January 15 following the applicable year for which the Incentive Fee is earned and on January 15 of the next two successive years. Notwithstanding the foregoing, upon any termination of this Amended Agreement for any reason, any unpaid Incentive Fee (including any Incentive Fee installment for the stub period ending on the termination date) shall become fully earned and immediately due and payable without regard to the FCCR Condition defined below, and shall be included in Net Earnings for purposes of determining any Termination Fee, if applicable, relating to such termination.

(f) Except when the Incentive Fee is due on the date of termination of this Amended Agreement, up to 50% of each installment of the Incentive Fee may be paid, at the option of the Company, in shares of Company Common Stock, with the balance payable in cash and the number of shares of Company Common Stock to be issued being equal to the portion of the Incentive Fee being paid in shares of Company Common Stock divided by the Market Price of the Company Common Stock on the last trading day of the prior fiscal year or the stub period

13

prior to the payment of the applicable installment of the Incentive Fee; *provided, that* the entire Incentive Fee must be paid by the Company entirely in cash if, at the time for payment of the Incentive Fee:

(i) the Advisor (or its Affiliates) owns shares of Company Common Stock or Common Units in an amount (determined with reference to the Market Price of the Company Common Stock on the last trading day of the year or stub period) greater in value than or equal to three times the Base Fee actually paid for the preceding four quarters;

(ii) payment in shares of Company Common Stock would cause, based upon advice from counsel to the Advisor, the Advisor to be subject to the provisions of the Investment Company Act of 1940, as amended (" *Investment Company Act* ");

(iii) the Company Common Stock is not listed on a national securities exchange (or it is reasonably foreseeable that the Company Common Stock will cease to be a listed on a national securities exchange during the next twelve (12) months); or

(iv) payment in shares of Company Common Stock could have or cause, based upon advice from counsel to the Advisor, an adverse effect on the Company's ability to maintain its status as a REIT or Remington's ability to maintain its status as an "eligible independent contractor" as defined in Section 856(d)(9) of the Code or would otherwise not be legally permissible for any reason.

(g) Upon determining the Incentive Fee, except in the case of any termination of this Amended Agreement in which case the Incentive Fee for the stub period and all unpaid installments of an Incentive Fee shall be deemed earned and fully due and payable, each one-third installment of the Incentive Fee shall not be deemed earned by Advisor or otherwise payable by the Company unless the Company, as of December 31 of the year immediately preceding the year of the due date for the payment of the Incentive Fee

installment, has a FCCR of 0.20x or greater (the "*FCCR Condition*"). For purposes hereof, "*FCCR* " shall mean the average ratio of the Company EBITDA to the Company Fixed Charges for the previous four consecutive fiscal quarters.

        6.3        Equity Compensation . To incentivize employees, officers, consultants, non-employee directors, Affiliates or representatives of the Advisor to achieve goals and business objectives of the Company, as established by the Board of Directors, in addition to the Base Fee and the Incentive Fee, the Board of Directors will have the authority to and shall make recommendations of annual equity awards to the Advisor or directly to employees, officers, consultants, non-employee directors, Affiliates or representatives of the Advisor, based on the achievement by the Company of certain financial or other objectives established by the Board of Directors or otherwise as the Board of Directors sees fit. The Company, at its option, may choose to issue such compensation in the form of equity awards in the Company or the Operating Partnership, unless and to the extent that receipt of such equity awards would adversely affect the Company's status as a REIT in which case, the equity awards shall be limited to equity awards in the Operating Partnership. For a period of one year from the date of issuance, any such equity awards in the Operating Partnership shall not be transferable, except by operation of law, without the written consent of the Company in its capacity as the general partner which consent may be

14

withheld in the sole and absolute discretion of the general partner; *provided, however* , the Advisor may assign, without the consent of the general partner, such equity awards to employees, officers, consultants, non-employees, directors, Affiliates or representatives of Advisor provided the one-year restriction on transfer shall remain applicable to such assignee. In addition, except as expressly provided above, any transfer of such equity awards at any time must comply with the transfer restrictions of the Operating Partnership's partnership agreement or the Company's charter and bylaws, as applicable.

        6.4        [RESERVED].

        6.5        Fee Waiver . The Advisor, or its Subsidiaries or Affiliates, may, at its or their option and in its or their sole discretion, choose to waive any fee or reimbursement payable or owing by the Company to the Advisor under this Amended Agreement; *provided, however* that the Advisor shall be able to offset any fees that it has waived against any reimbursement obligation that may at any time be owed by the Advisor or alleged to be owed to the Company. Notwithstanding anything to the contrary herein, any waiver of fees or reimbursements for one period shall have no impact on the calculation of the fees or reimbursements payable in any future period that may be based on the past period during which the waiver occurred.

        6.6        Fee Renegotiation . If the Advisor has given notice of its election to extend this Amended Agreement in accordance with Section 12.2 , either Party may then give written notice to the other Party at least one hundred eighty (180) days prior to the expiration of the then current term to renegotiate the amount of Base Fee or Incentive Fee payable by the Company. Following receipt of a renegotiation notice, each Party shall, for a period of up to sixty (60) days, use its commercially reasonable efforts to negotiate in good faith a revised compensation amount or amounts. If the Parties are unable to agree on a revised Base Fee or Incentive Fee, then the revised compensation amount shall be determined by an " *Arbitration Panel* " comprised of three members all of whom have sufficient knowledge and experience of external asset management entities, the national hospitality lodging industry generally and industry standards and market trends for similar advisory agreements in the United States. The Advisor shall have the right to select one member of the panel (the " *Advisor Panel Member* "). The Company shall have the right to select one member of the panel (the " *Company Panel Member* "). The third member of the panel shall be selected by the mutual agreement of the Company Panel Member and the Advisor Panel Member; provided that in no event may the Arbitration Panel reduce the multiplier for the Base Fee below 0.65% or increase the multiplier for the Base Fee above 0.75% during the term of this Amended Agreement, including all extensions. Further, in no event shall the Arbitration Panel reduce the Incentive Fee multiplier below 0.04 or increase the Incentive Fee multiplier above 0.06 during the term of this Amended Agreement. Each Party shall submit, in writing, a statement summarizing its fee proposal and the underlying rationale therefor with ten (10) business days after selection of the Arbitration Panel is complete. If the Arbitration Panel requests an in person meeting or teleconference in addition to written statements, the Parties shall use commercially reasonable efforts to attend, and the Parties shall promptly comply with all other reasonable requests by the Arbitrator, including requests for information, books, records and similar items. The Arbitration Panel shall make a final determination, and notify the parties in writing as soon as practicable but in no event later than thirty (30) days after the panel's decision no later than thirty (30) days after the

15

Arbitration Panel is selected. The decision of the Arbitration Panel shall be final, binding and non-appealable on the Parties thereto.

        6.7        Expense Reporting . The Advisor shall disclose, in each Quarterly Report on Form 10-Q and each Annual Report on Form 10-K that it files under the Exchange Act, the total incremental expenses incurred by the Advisor (including all reimbursable expenses) as reasonably determined by the Advisor for the period covered by the report in connection with providing services to the Company under this Amended Agreement, which determination shall be conclusive and binding on the Parties. No later than 30 days

after the end of each fiscal quarter or 45 days in the case of the fourth quarter, the Advisor shall provide the Audit Committee with a report, substantially in the form agreed upon by the Parties in connection with this Amended Agreement, of an Accounting Firm that the Advisor's determination of the total incremental expenses for the applicable period is reasonable.  So long as the Accounting Firm's report is delivered to the Audit Committee in accordance with the form agreed upon by the Parties, the total incremental expenses determined by the Advisor for the applicable period covered by the Accounting Firm's report shall be binding on both Parties and not subject to revision or challenge.  The Advisor acknowledges and agrees that, to the extent it is no longer required to file reports under the Exchange Act, the Advisor will separately report the amount of total incremental expenses as reasonably determined by the Advisor for the applicable period to the Audit Committee.

7.      LIMITATION ON ACTIVITIES.  Except for actions taken at the direction of the Board or in good faith, subject to the Company complying with Section 9.1(c)  and notwithstanding anything in this Amended Agreement to the contrary, the Advisor shall not take any action which would (a) adversely affect the then effective tax status of the Company as a REIT, (b) subject the Company to regulation under the Investment Company Act, (c) knowingly and intentionally cause the Company to violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Company, (d) cause the Company to violate any of the rules or regulations of any exchange on which the Company's securities are listed, the result of which is likely to cause the Company to be delisted or (e) cause the Company to violate the Company's charter, the Company's bylaws or any resolutions of the Board of Directors, all as in effect from time to time.  The Advisor acknowledges that the Company maintains codes and policies intended to help maintain compliance with applicable laws and regulations and agrees to require its employees who provide services to the Company to comply with all applicable codes and policies.

8.      LIMITATION OF LIABILITY AND INDEMNIFICATION.

8.1     Limitation on Liability .  The Advisor shall have no responsibility other than to render the services and take the actions described herein in good faith and with the exercise of due care and shall not be responsible for any action of the Board of Directors in following or declining to follow any advice or recommendation of the Advisor.  The Advisor (including its officers, directors, managers, employees and members) will not be liable for any act or omission by the Advisor (or its officers, directors, managers, employees and members) performed in accordance with and pursuant to this Amended Agreement, except by reason of acts or omissions constituting gross negligence, bad faith, willful misconduct or reckless disregard of duties under this Amended Agreement.

16

8.2     Insurance Coverage of the Advisor .  The Advisor shall maintain errors and omissions insurance coverage and other insurance coverage in amounts which are customarily carried by asset managers performing functions similar to those of the Advisor under this Amended Agreement.  No fidelity bond shall be required.

8.3     Indemnification .

(a)     The Company shall reimburse, indemnify and hold harmless the Advisor and its Affiliates, and their respective partners, directors, officers, managers, members, agents, employees and each other Person, if any, controlling the Advisor (each, an " *Advisor Indemnified Party* "), to the fullest and broadest extent permitted under the Company's charter and bylaws and the corporate law of the jurisdiction in which the Company is incorporated including all mandatory provisions that may not be waived from and against any and all losses, claims, damages, liabilities, costs and expenses of any nature whatsoever, including, without limitation, attorney's fees, court costs, and similar fees and expenses (" *Expenses* ") with respect to or arising out of this Amended Agreement or the performance by the Advisor of its responsibilities and obligations hereunder (including any pending or threatened litigation except for any Proceeding filed by a stockholder of the Advisor against the Advisor), from any acts or omission of the Advisor (including ordinary negligence and any action taken by the Advisor following a directive by the Board of Directors in its capacity as such and Expenses incurred by the Advisor under Section 5 ), except with respect to Expenses with respect to or arising out of the Advisor Indemnified Party's gross negligence, bad faith or willful misconduct, or reckless disregard of its duties under this Amended Agreement.

(b)     The Advisor shall reimburse, indemnify and hold harmless the Company, and its partners, directors, officers, managers, members, agents, employees and each other Person, if any, controlling the Company (each, a " *Company Indemnified Party* ;" an Advisor Indemnified Party and a Company Indemnified Party are each sometimes hereinafter referred to as an " *Indemnified Party* ") from and against any and all Expenses in respect of or arising from (i) any acts or omissions of the Advisor constituting bad faith, willful misconduct, gross negligence or reckless disregard of duties of the Advisor under this Amended Agreement or (ii) any claims by employees of the Advisor relating to the terms and conditions of their employment by the Advisor.

(c)     The Company shall reimburse, indemnify and hold each Advisor Indemnified Party harmless from and against any Expenses, joint or several, to which such Advisor Indemnified Party may become subject under the Securities Act, the Exchange Act or otherwise, insofar as such Expenses (or Proceedings, whether commenced or threatened, in respect thereof) are arising out of or based upon any untrue statement or alleged untrue statement of any material fact contained in any filing with the SEC, any document related to a private offering of securities or any statement of any kind made by the Company and arising out of or based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a

registration statement or prospectus related to an offering of securities registered under the Securities Act, in light of the circumstances under which they were made) not misleading, and will reimburse each such Advisor Indemnified Party for any legal or other expenses reasonably incurred or other Expenses by them in connection with investigating, defending or initiating any such Proceeding. The

indemnity hereunder shall remain in full force and effect regardless of any investigation made by or on behalf of any Advisor Indemnified Party or any director, officer or controlling person of any Advisor Indemnified Party, and shall survive the termination of this Amended Agreement pursuant to Section 12 . If the indemnification provided for in this Section 8.3(c) is held by a court or government agency of competent jurisdiction to be unavailable to an Indemnified Party or is insufficient to hold the Indemnified Party harmless in respect of any Expenses, then each Indemnified Party shall contribute to the amount paid or payable by the Indemnified Party as between the Advisor, on the one hand, and the Company, on the other hand, in such proportion as is appropriate to reflect the relative fault of Advisor, on the one hand, and of the Company, on the other, as well as any other relevant equitable considerations. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who is not guilty of fraudulent misrepresentation.

(d)     Promptly after receipt by an Indemnified Party of notice of the commencement (or threat of commencement) of any Proceeding, the Indemnified Party shall, if a claim in respect thereof is to be made pursuant hereto, notify the indemnifying party in writing of the commencement thereof; but the omission to so notify the indemnifying party shall not relieve it from any liability that it may have to any Indemnified Party pursuant to this Section 8.3 . In case any such Proceeding shall be brought against an Indemnified Party and it shall notify the indemnifying party of the commencement thereof, the indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, to assume the defense thereof, with counsel satisfactory to such Indemnified Party and, after notice from the indemnifying party to such Indemnified Party of the indemnifying party's election to assume the defense thereof, the indemnifying party shall not be liable to such Indemnified Party under Section 8.3 hereof, as applicable, for any legal expenses of other counsel retained by the Indemnified Party or any of the expenses related thereto, in each case subsequently incurred by such Indemnified Party, unless (i) the indemnifying party and the Indemnified Party shall have mutually agreed to the retention of such counsel, or (ii) the named parties to any such Proceeding (including any impleaded parties) include both the indemnifying party and Indemnified Party and representation of both parties by the same counsel would be inappropriate in the reasonable opinion of the Indemnified Party, due to actual or potential differing interests between them. The obligations of the indemnifying party under this Section 8.3 shall be in addition to any liability which the indemnifying party otherwise may have under applicable law or otherwise.

(e)     The Company shall advance funds to an Advisor Indemnified Party upon request for any expenses and other costs incurred as a result of any pending or threatened Proceeding or the initiation of a Proceeding by any Advisor Indemnified Party if (i) such Proceeding relates to or arises out of, or is alleged to relate to or arise out of or has been caused or alleged to have been caused in whole or in part by, any action or inaction on the part of the Advisor Indemnified Party in the performance of its duties or provision of its services hereunder; and (ii) the Advisor Indemnified Party undertakes to repay any funds advanced pursuant to this Section 8.3(e) in cases in which such Advisor Indemnified Party would not be entitled to indemnification under this Section 8.3 . If advances are required under this Section 8.3(e) , the Advisor Indemnified Party shall furnish the Company with an undertaking as set forth in clause (ii) of the preceding sentence and shall thereafter have the right to bill the Company for, or otherwise require the Company to pay, at any time and from time to time after such Advisor Indemnified Party shall become obligated to make payment therefor, any and all

18

reasonable amounts for which such Advisor Indemnified Party is entitled to indemnification under Section 8.3 , and the Company shall pay the same within thirty (30) days after request for payment. In the event that a determination is made by a court of competent jurisdiction or an arbitrator that the Company is not so obligated in respect of any amount paid by it to a particular Advisor Indemnified Party, such Advisor Indemnified Party will refund such amount within sixty (60) days of such determination, and in the event that a determination by a court of competent jurisdiction or an arbitrator is made that the Company is so obligated in respect to any amount not paid by the Company to a particular Advisor Indemnified Party, the Company will pay such amount to such Advisor Indemnified Party within thirty (30) days of such final determination, in either case together with interest at the current prime rate plus 2% from the date paid until repaid or the date it was obligated to be paid until the date actually paid.

9.     RELATIONSHIP OF ADVISOR AND COMPANY; CAPITALIZATION.

9.1     Contractual Relationship .

(a)     The relationship between the Company and the Advisor under this Amended Agreement shall be contractual in nature. The Company and the Advisor are not partners or joint venturers with each other, and nothing in this Amended Agreement shall be construed to make the Company and the Advisor partners or joint venturers. Nothing herein contained shall prevent the

Advisor from engaging in other activities, including, without limitation, the rendering of advice to other Persons (including other REITs) and to the management of Ashford Hospitality Trust, Inc. ("*Ashford Trust*"), or other programs advised, sponsored or organized by the Advisor, Ashford Trust or their Affiliates.  The Company shall not revise its Investment Guidelines to be directly competitive with all or any portion of Ashford Trust's Investment Guidelines in effect as of November 19, 2013 or with all or any portion of the initial Investment Guidelines of any Spin-Off Company.  The Company acknowledges that the Ashford Trust's Investment Guidelines as of November 19, 2013 and as of the date hereof include all segments of the hospitality industry (including, without limitation, direct, joint venture and debt investments in hotels, condo-hotels, time-shares and other hospitality related assets), with revenue per available room ("*RevPAR*") criteria less than two times the then-current U.S. average RevPAR.  The Company further acknowledges that any subsequent change to Ashford Trust's Investment Guidelines, including in connection with any future spin-off, carve-out, split-off or other consummation of a transfer of a division or subset of assets for the purpose of forming a joint venture, a newly created private platform or a new publicly-traded company will not have any impact on or change Ashford Trust's Investment Guidelines as of November 19, 2013 and as of the date hereof for purposes of enforcing this Section 9.  Except as described in this Section 9.1, this Amended Agreement shall not limit or restrict the right of any manager, director, officer, employee or equityholder of the Advisor or its Affiliates to engage in any other business or to render services of any kind to any other Person.  The Advisor may, with respect to any investment or activity in which the Company or its Affiliates is a participant, also render advice and service to each and every other participant therein associated with such investments or activities.

(b) Subject to Section 9.3, to the extent the Advisor deems an investment opportunity suitable for recommendation, the Advisor must present the Company with any investment opportunity that satisfies the Company's Initial Investment Guidelines to the

Company.  The Board of Directors will then have ten (10) business days to accept such opportunity, and, thereafter, the Advisor may present the opportunity to Ashford Trust or any other Person advised by the Advisor.  Except as set forth in the preceding sentence, the Company recognizes that it is not entitled to preferential treatment and is only entitled to equitable treatment in receiving information, recommendations and other services.  The Company shall have the benefit of the Advisor's commercially reasonable best efforts and judgment and the Advisor shall not undertake any activities that, in its good faith judgment, will materially and adversely affect the performance of its obligations under this Amended Agreement.

(c) The Advisor's obligations hereunder shall, at all times, be subject to the Company funding sufficient working capital, in amounts deemed necessary by the Advisor to operate the Company and oversee its assets on a day-to-day basis and otherwise perform its duties hereunder.

9.2 Joint Efforts and Mutual Support.  The Company acknowledges that the Advisor advises Ashford Trust and may enter into an advisory relationship with additional entities in the future.  The Parties hereto agree and acknowledge that each of the Company, the Advisor and Ashford Trust, as well as other Persons that the Advisor may advise in the future, may benefit from the strategic relationships between such Persons and accordingly intend to cooperate to achieve results, pursue transactions jointly or establish other strategic relationships that are in the best interests of each such entities' respective shareholders.  From time to time, as may be determined by the Independent Directors or the Independent Directors of the Advisor, Ashford Trust and any other Persons that the Advisor may advise in the future, each such entity may provide financial accommodations, guaranties, back-stop guaranties, and other forms of financial assistance to the other entities on terms that the Independent Directors of the respect boards of directors determine to be fair and reasonable.  Further to the forgoing, as to potential joint efforts and mutual support, the Parties hereto have established a process whereby the Advisor may assist the Company with its asset acquisitions through the provision of Key Money Investments as provided in Section 16.  Similarly, the Advisor's growth plans include accessing capital through channels beyond those regularly accessed as of the date hereof, including institutional and other private capital and retail capital (generally through independent commissioned or fee based financial advisory firms).  In such regard, the Company shall give due consideration to proposals by the Advisor to co-invest in assets with capital sourced by the Advisor from such channels or to support the creation of platforms that facilitate access to such capital sources.

9.3 Conflicts of Interest.

(a) To minimize conflicts between Ashford Trust and the Company, both of which are advised by the Advisor, Ashford Trust and the Company have identified a principal investment focus and have set parameters for real estate investments, including parameters primarily relating to RevPAR, segments, markets and other factors or financial metrics.  The asset type, together with the relevant parameters for investments are referred to as such Person's "*Investment Guidelines*," and the "*Initial Investment Guidelines*" of the Company are the Investment Guidelines of the Company as set forth below.  The Company may modify or supplement, after consultation with Advisor, the Company's Investment Guidelines upon written notice to the Advisor from time to time (subject, however, to the prohibition in Section 9.1(a)

restricting the Company from changing the Initial Investment Guidelines to be directly competitive with all or any portion of Ashford Trust's Investment Guidelines as of November 19, 2013 or the initial Investment Guidelines of any Spin-Off Company). The Company's Investment Guidelines as of the date hereof are hotel real estate assets primarily consisting of equity or ownership interests, as well as debt investments when such debt is acquired, or secured with appropriate means, with the intent of obtaining an equity or ownership interest, in:

(i) full service and urban select service hotels with trailing 12-month average RevPAR or anticipated 12-month average RevPAR of at least 2.0 times the then-current U.S. national average RevPAR for all hotels as determined with reference to the most current Smith Travel Research reports, generally in the 20 most populous metropolitan statistical areas, as estimated by the United States Census Bureau and delineated by the U.S. Office of Management and Budget;

(ii) luxury hotels meeting the RevPAR criteria set forth in clause (i) above and situated in markets that may be generally recognized as resort markets; and

(iii) international hospitality assets predominantly focused in areas that are general destinations or in close proximity to major transportation hubs or business centers, such that the area serves as a significant entry or departure point to a foreign country or region of a foreign country for business or leisure travelers and meet, or are projected to meet, the RevPAR criteria set forth in clause (i) for that asset as compared to the average RevPAR for the foreign country in which the asset is located.

In determining whether an asset satisfies the Company's Investment Guidelines, the Advisor shall make a good faith determination of projected RevPAR, taking into account historical RevPAR as well as such additional considerations as conversions or reposition of assets, capital plans, brand changes and other factors that may reasonably be forecasted to raise RevPAR after stabilization of such initiative.

(b) If the Company materially modifies its Initial Investment Guidelines set forth in Section 9.3(a) above without the written consent of the Advisor, the Advisor will not have an obligation to present investment opportunities to the Company as set forth in Section 9.1(b) above at any time thereafter, regardless of any subsequent modifications by the Company to its Investment Guidelines. The Advisor shall allocate investment opportunities to Persons (including, without limitation, Ashford Trust, the Company, any Spin-Off Companies or other Persons) which Advisor advises consistent with the terms of this Amended Agreement, taking into account such factors as the Advisor deems relevant, in its discretion, subject to any then existing or future obligations that the Advisor may have to other Persons. The Company acknowledges that if it materially modifies its Initial Investment Guidelines, the Company will be entitled only to the Advisor's reasonable best judgment in allocating investment opportunities but will not be entitled to the rights set forth in Section 9.1(b).

(c) If the Advisor sources or otherwise has access to a portfolio of assets comprised of assets that satisfy the Company's Investment Guidelines and Ashford Trust's

21

Investment Guidelines as in effect as of the date hereof or, as applicable, one or more other Persons advised by the Advisor, the Advisor will endeavor in its sole judgment made in good faith to present the opportunity to the Company and, if applicable, such other Person(s) (including Ashford Trust) to the extent the Advisor determines that such portfolio can be reasonably divided by asset type and acquired on the basis of such asset types in satisfaction of each Person's Investment Guidelines. If the Company and, if applicable, such other Person(s) (including Ashford Trust) approve its portion of such acquisition, the Company and, if applicable, such other Person(s) (including Ashford Trust) will cooperate in good faith in completing the acquisition of the portfolio. If the portfolio cannot be reasonably separated by asset type, the Advisor shall allocate portfolio investment opportunities, in its sole and absolute discretion, between the Company and, if applicable, other Persons (including Ashford Trust) advised by the Advisor, in an equitable manner consistent with the Company's Investment Guidelines and, if applicable, Investment Guidelines of other Persons (including Ashford Trust) advised by the Advisor. In making this determination, the Advisor will consider, in its sole discretion, the Investment Guidelines and investment strategy of each entity with respect to the acquisition of properties, portfolio concentrations, tax consequences, regulatory restrictions, liquidity requirements, leverage and other factors deemed relevant by the Advisor. Notwithstanding the foregoing, if the Company materially modifies its Initial Investment Guidelines without the written consent of the Advisor, the Advisor will not have an obligation to present portfolio acquisition opportunities to the Company as set forth in this Section 9.3(c) at any time thereafter, regardless of any subsequent modifications by the Company to its Investment Guidelines. Instead, the Advisor shall use its judgment in determining whether to allocate any portion of a portfolio investment to the Company, taking into account such factors as the Advisor deems relevant, in its sole and absolute discretion, subject to any obligations that the Advisor may have to other Persons; *provided, that* the Advisor will have no obligation to make any such portfolio investment opportunity available to the Company.

9.4      Exclusive Provider of Products or Services.

(a) If at any time the Company desires to engage a third party to perform services or deliver products (other than the services contemplated by this Amended Agreement, these services, the " *Additional Services* ") and provided that the Company has the right to control the decision on the award of the applicable contract, the Advisor directly or through Affiliates including Majority or Minority Subsidiaries, shall have the exclusive right to provide the Additional Services at Market Rates.  Any proposal of the Advisor to provide Additional Services must be approved by a vote of a majority of the Independent Directors.  The Independent Directors shall vote upon the proposal made by the Advisor within ten (10) business days of receipt from the Advisor.  The Advisor shall have no authority or obligation to provide the Additional Services unless and until approved by the requisite vote of the Independent Directors.

(b) If a majority of the Independent Directors of the Company affirmatively votes that the proposed pricing of the Advisor is not at a Market Rate, then the Company and the Advisor shall engage a recognized consultant acceptable to each of the Company and the Advisor to determine the Market Rates for the Additional Services; *provided, however* , if the Company and the Advisor cannot agree on a mutually acceptable consultant, each of the Company and the Advisor shall name a recognized consultant and those two shall select

22

the consultant to be used for the purposes of this Section 9.4 .  If the consultant's opinion of Market Rates reflects Market Rates lower than the pricing proposed by the Advisor, the Advisor will pay the expenses of the consultant and shall have the option to provide the Additional Services at Market Rates as determined by the consultant.  If the consultant determines that the proposed pricing by the Advisor is at or below Market Rates, then the Company shall pay the expenses of the consultant and shall engage Advisor at the Market Rate as determined by the consultant.  If the Company rejects Additional Services proposed by the Advisor and later determines to utilize the same Additional Services, the Advisor, directly or through Affiliates including Majority or Minority Subsidiaries, shall have the exclusive right to provide those Additional Services, subject to the process to confirm Market Rates in this Section 9.4(b) .

(c) The Company acknowledges that the Advisor (and its Affiliates) may receive allowances, rebates or other payments in exchange for the purchase or lease of goods, services, systems or programs involving any services or products provided or sold to the Company, its Affiliates and any hotels owned by the Company.  In each case, the Advisor shall provide the Company's Independent Directors with information regarding the nature and amount of the allowance, rebate or other payment and the Advisor shall be permitted to receive the allowance, rebate or other payment subject to the approval of the Company's Independent Directors, which approval shall not be unreasonably withheld.

9.5 The Ashford Name .  The Advisor and its Affiliates have a proprietary interest in the trademarked "Ashford" name and logo.  The Advisor hereby grants to the Company a non-transferable, non-assignable, non-exclusive royalty-free right and license to use the "Ashford" name and logo during the term of this Amended Agreement.  Accordingly, and in recognition of this right, if at any time the Company ceases to retain the Advisor or one of its Affiliates to perform advisory services for the Company, the Company will, within sixty (60) days after receipt of written request from the Advisor, cease to conduct business under or use the name "Ashford" or any derivative thereof and the Company shall change its name and the names of any of its Subsidiaries to a name that does not contain the name "Ashford" or any other word or words that might, in the reasonable discretion of the Advisor, be susceptible of indication of some form of relationship between the Company and the Advisor or any its Affiliates.  At such time, the Company will also make any changes to any trademarks, service marks, logos, or other marks necessary to remove any references to the word "Ashford." Consistent with the foregoing, it is specifically recognized that the Advisor or one or more of its Affiliates has in the past and may in the future organize, sponsor or otherwise permit to exist other investment vehicles (including vehicles for investment in real estate) and financial and service organizations having "Ashford" as a part of their name and using the "Ashford" logo, all without the need for any consent (and without the right to object thereto) by the Company.

10. BOOKS AND RECORDS.  All books and records compiled by the Advisor with respect to the Company's business and assets in the course of discharging its responsibilities under this Amended Agreement shall be the property of the Company and shall be delivered by the Advisor to the Company immediately upon any termination of this Amended Agreement regardless of the grounds for such termination (including, but not limited to, a breach by the Company of this Amended Agreement); *provided, however* , that the Advisor shall have reasonable access to such books and records to the extent reasonably necessary in connection with the conduct of its services hereunder and may, in any event, retain a copy of the books and

23

records.  During the term of this Amended Agreement, the books and records of the Company maintained by the Advisor shall be accessible for inspection by any designated representative of the Company upon reasonable advance notice and during normal business hours.

11. CONFIDENTIALITY.

11.1    Confidential Information; Duty to Keep Confidential. Each of the Advisor and the Company shall keep confidential any and all non-public information about the other Party (" *Confidential Information* "), written or oral, obtained by such Party in connection with this Amended Agreement except that such Confidential Information may be shared (a) with Affiliates, officers, directors, employees, agents and other parties who need such Confidential Information for either Party to be able to perform its duties or obligations hereunder, (b) with appraisers, lenders, bankers and other parties as necessary in the ordinary course of either Party's business, (c) in connection with any governmental or regulatory filings of either Party, filings with the New York Stock Exchange or other applicable securities exchanges or markets, or disclosure or presentations to Company investors (subject to compliance with Regulation FD), (d) with governmental officials having jurisdiction over the Company and (e) as required by law, rule or regulation.

11.2    Permitted Disclosure . Nothing will prevent either Party from disclosing Confidential Information (a) upon the order of any court or administrative agency, (b) upon the request or demand of, or pursuant to any law or regulation to, any regulatory agency or authority, (c) to the extent reasonably required in connection with the exercise of any right or remedy under this Amended Agreement, or (d) to either Party's legal counsel or independent auditors; *provided, however that* with respect to (a) and (b), so long as legally permissible, whichever Party discloses any Confidential Information shall give notice to the other Party so that such Party may seek, at its sole expense, an appropriate protective order or waiver.

11.3    Exclusions . For purposes of this Amended Agreement, Confidential Information shall not include (a) information that is available to the public from a source other than the applicable Party, (b) information that is released in writing by the applicable Party to the public or to persons who are not under similar obligations of confidentiality to the applicable Party, or (c) information that is obtained by the applicable Party from a third party which, to the best of the applicable Party's knowledge, does not constitute a breach by such third party of an obligation of confidence.

12.    TERM AND TERMINATION.

12.1    Term . This Amended Agreement shall be effective on the date of Company Stockholder Approval. The initial term of this Amended Agreement shall expire on January 24, 2027, subject to Section 12.2 hereunder.

12.2    Term Extension Rights of Advisor . This Amended Agreement may be extended by the Advisor for up to seven successive additional ten-year terms upon written notice to the Company, given at least two hundred and ten (210) days prior to the expiration of the then current term, of the Advisor's election to extend this Amended Agreement on the same terms and conditions of this Amended Agreement, subject to the rights of the Parties under Section 6.6 .

24

12.3    Termination by the Company . This Amended Agreement may be terminated by the Company upon written notice to the Advisor and no Termination Fee shall be due and payable by the Company to the Advisor under the following circumstances:

(a)    upon the Advisor's conviction (including a plea or nolo contendere) by a court of competent jurisdiction of a felony;

(b)    if the Advisor commits an act of fraud against the Company, converts the funds of the Company or acts in a manner constituting gross negligence in the performance of the Advisor's material duties under this Amended Agreement (including a failure to act); provided, however, that the Company will not have the right to terminate this Amended Agreement if any fraud, conversion or actions or omissions described in this Section 12.3(b) are caused by an employee or an officer of the Advisor or an Affiliate of the Advisor and the Advisor takes all reasonable necessary and appropriate action against that person and cures the damage incurred by the Company within 45 days of the Advisor's actual knowledge of the commission or omission;

(c)    a Bankruptcy Event occurs with respect to the Advisor; or

(d)    (i) upon the entry by a court of competent jurisdiction of a final non-appealable order awarding monetary damages to the Company based on a finding that the Advisor committed a material breach or default of a material term, condition, obligation or covenant of this Amended Agreement, which breach or default had a Material Adverse Effect, but only where the Advisor fails to pay the monetary damages in full within sixty (60) days of the date when the monetary judgment becomes final and non-appealable. For the avoidance of doubt, if the Advisor pays the monetary judgment in full within sixty (60) days of the judgment becoming final and non-appealable, the Company shall not have the right to terminate this Amended Agreement. Notwithstanding the above, if the Advisor notifies the Company that the Advisor is unable to pay any judgment for monetary damages in full within 60 days of when the judgment becomes final and non-appealable, the Company may not terminate this Amended Agreement if, within the 60-day period, the Advisor delivers a promissory note to the Company having a principal amount equal to the unpaid balance of the judgment and bearing interest at 8.00% per annum, which note shall mature on the 12 month anniversary of the date that the court's judgment becomes final and non-appealable. The Company may terminate this Amended Agreement if the Advisor fails to pay all principal and interest due under the note by the maturity date of the note.